UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDEN ROBINSON,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>A. JACKSON,<br><br>　　　　　Defendant. | Case No. 18-cv-06814-HSG<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 24 |

Plaintiff filed this *pro se* civil rights action under 42 U.S.C. § 1983 alleging that Alameda County deputy Jackson used excessive force on him when he was previously housed as a pretrial detainee at Santa Rita County Jail. Defendant Jackson has filed a summary judgment motion. Dkt. Nos. 24, 25, 26. Plaintiff has filed an opposition, and defendant Jackson has filed a reply. Dkt. Nos. 44, 45. For the reasons set forth below, the Court GRANTS defendant Jackson's summary judgment motion.

**FACTUAL BACKGROUND**

The following facts are undisputed unless otherwise noted.

This excessive force claim arises out of an April 22, 2018 search of plaintiff by defendant Jackson. Plaintiff has asthma. Defendant Jackson suspected that plaintiff was in possession of contraband because he saw plaintiff make a furtive, quick movement with his hands like he was hiding something and then noticed a green leafy substance on the floor where plaintiff had been sitting when he made the movement. Dkt. No. 24-1 ("Jackson Decl.") ¶¶ 3-4. Defendant Jackson ordered plaintiff and his co-worker to report to the multi-purpose room for a visual strip search. Dkt. No. 44 at 2. Defendant Jackson directed plaintiff to lift his scrotum. As plaintiff did so, defendant glimpsed a blue bindle protruding from between plaintiff's fingers. Jackson Decl. ¶ 5.

Defendant Jackson ordered plaintiff to hand him the bindle. Jackson Decl. ¶ 5. Plaintiff instead placed it in his mouth and faced away from defendant Jackson. Jackson Decl. ¶ 5.

The parties offer differing accounts as to what happened next.

According to plaintiff, after defendant Jackson accused him of having contraband inside his mouth, defendant Jackson started choking him and yelling, "spit it out." Dkt. No. 44 at 2. Plaintiff told defendant Jackson that he "did not have anything and couldn't." Dkt. No. 44 at 2. Defendant Jackson handcuffed plaintiff and then continued to choke plaintiff. Dkt. No. 44 at 2. Plaintiff was fearful that he would pass out. To escape the pressure on his throat, plaintiff spun out of defendant Jackson's chokehold. Dkt. No. 44 at 2. Defendant Jackson responded by forcefully pushing plaintiff face-first into the door frame. When plaintiff bounced back from the door frame, defendant Jackson "choke-slammed" plaintiff from behind onto the floor and onto plaintiff's shoulder, dislocating plaintiff's shoulder and damaging the shoulder ligaments. Dkt. No. 44 at 2. Plaintiff states that he asked multiple times that an x-ray be used to confirm that he was not in possession of contraband, but his requests were ignored. Dkt. No. 44 at 2-3, 5.

Defendant Jackson provides the following account of the disputed events.

During this encounter, defendant Jackson was wearing a body-worn camera ("BWC"). For privacy reasons, BWCs are not turned on during strip searches. Jackson Decl., ¶ 6, Ex. A at 4. When not turned on, the BWC records a short section of video passively, without audio, which records over itself and is not retained. Dkt. No. 24-4 ("Carone Decl.") ¶¶ 2-3. Once the camera is turned on, the audio comes on and any not-yet-overwritten video that preceded the camera being turned on is added to the footage. Carone Decl. ¶¶ 2-3.

When plaintiff placed the bindle in his mouth, faced away from defendant Jackson, and refused to spit out the bindle, defendant Jackson turned on his BWC. Jackson Decl., ¶ 6, Ex. A at 5. To prevent plaintiff from swallowing the bindle, defendant Jackson placed his fingers and thumb on either side of plaintiff's head under the rear of his jaw, as he had been trained to do. Jackson Decl. ¶ 6 and Ex. B (BWC video) at 00:23-00:27. Defendant Jackson did not choke plaintiff. Plaintiff spun out of defendant Jackson's grasp and ran towards the door. Jackson Decl. ¶ 7 and Ex. B (BWC video) at 00:30-00:37. The parties struggled at the door. Defendant Jackson

resumed putting his fingers on the same two pressure points to prevent plaintiff from swallowing, while ordering plaintiff to spit out the bindle and open his mouth. Jackson Decl. ¶ 7 and Ex. B (BWC video) at 00:30-00:37. Plaintiff continued to resist and try to break free, and defendant Jackson used his body weight to take plaintiff to the ground. Jackson Decl. ¶ 7. Defendant Jackson's BWC fell off during the struggle, resulting in the video being largely obscured and the audio being staticky. Jackson Decl. ¶ 7 and Ex. B (BWC video) at 00:30-00:37. Defendant Jackson continued to instruct plaintiff to spit out the bindle, but plaintiff kept his mouth closed. Jackson Decl. ¶ 7.

Other correctional officials arrived and escorted plaintiff to an isolation cell. Jackson Decl. ¶ 8. Defendant Jackson entered the isolation cell and asked plaintiff what he had swallowed, warning him that if he had swallowed meth, he would be in trouble. Jackson Decl. ¶ 9 and Ex. B (BWC video) at 01:53-02:07. Plaintiff did not answer. Jackson Decl. ¶ 9 and Ex. B (BWC video) at 02:10-02:23. Defendant Jackson left to get a nurse to examine plaintiff. Upon his return, defendant Jackson was informed by the deputies who had been observing plaintiff that plaintiff had spit something into the toilet and flushed it. Jackson Decl. ¶ 9. Defendant Jackson reentered the cell and verbally confronted plaintiff. Plaintiff's response is inaudible on the video. Defendant Jackson then responded, "Yeah I saw that you had that, I saw that . . . then now you decide you gonna spit it out, you spit in there. . ." to which plaintiff responded, "It ain't nothing but a kite man." Jackson Decl. ¶ 10 and Ex. B (BWC video) at 01:53-02:07.

Defendant Jackson asked plaintiff if he was injured. Jackson Decl. ¶ 11 and Ex. B (BWC video) at 03:57-04:29. Plaintiff responded that he was injured but did not respond when asked to identify his injuries. Jackson Decl. ¶ 11 and Ex. B (BWC video) at 04:38-04:45. A couple minutes later, after being given some clothing, plaintiff responded to a different officer's questions about his injuries by stating that his shoulder, wrist and face were hurt. Jackson Decl. ¶ 11 and Ex. B (BWC video) at 06:16-06:27. That evening, plaintiff complained to medical staff that he could not feel or move his right arm. Dkt. No. 24-7 at 3. However, a nurse observed plaintiff moving his right arm while sleeping. Dkt. No. 24-7 at 3. In response to plaintiff's complaint, an x-ray was taken of his right arm on April 24, 2018. Dkt. No. 24-7 at 3-4. The x-ray impression

3

1   was an anterior glenohumeral subluxation, or dislocation, with no fractures. Dkt. No. 24-7 at 4-5.
2   That same day, medical staff reviewed the x-ray and examined plaintiff. Dkt. No. 24-7 at 6.
3   Medical staff was able to help plaintiff rotate his right arm and place it in front of him. Dkt. No.
4   24-7 at 6. Medical staff concluded that the x-ray showed no dislocations or fractures and that
5   plaintiff was suffering from a shoulder strain/sprain. Dkt. No. 24-7 at 6.

      The parties acknowledge that no bindle or contraband was ever recovered.

## DISCUSSION

### I.   Summary Judgment Standard

      Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

      A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, 'designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e)).

      For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

## II.     Legal Standard for Excessive Force Claims

The Due Process Clause of the Fourteenth Amendment protects a post-arraignment pretrial detainee from the use of excessive force that amounts to punishment.[1]  *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (citing *Bell v. Wolfish*, 441 U.S. 520, 535-39 (1979)).  To prove an excessive force claim under § 1983, a pretrial detainee must show only that the "force purposely or knowingly used against him was objectively unreasonable."  *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  The Supreme Court has cautioned that "[a] court (judge or jury) cannot apply this standard mechanically."  *Id*.

> A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security."

*Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)) (alterations in original).  "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'"  *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  A non-exhaustive list of considerations that may bear on the reasonableness of the force used include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."  *Id.*

Because the *Kingsley* standard applicable to excessive force claims by pretrial detainees is

---

[1] Plaintiff incorrectly applies the Eighth Amendment standard for use of excessive force, which applies only to excessive force claims brought by convicted inmates.  The Eighth Amendment legal standard for excessive force claims is subjective and asks whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Id.* Excessive force claims brought by pretrial detainees are governed by the Fourteenth Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389, 397-400 (2015).  This Fourteenth Amendment legal standard for excessive force claims is objective and asks whether the force used was objectively unreasonable.  *Kingsley*, 576 U.S. at 397.

1    purely objective, it does not matter whether the defendant understood that the force used was

2    excessive or intended it to be excessive. *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1069 (9th

3    Cir. 2016) (en banc). A pretrial detainee can prevail by providing "'*objective* evidence that the

4    challenged governmental action is not rationally related to a legitimate governmental objective or

5    that it is excessive in relation to that purpose.'" *Id.* (quoting *Kingsley*, 135 S. Ct. at 2473-74))

6    (emphasis in original).

**III.    Analysis**

Defendant Jackson argues that he is entitled to summary judgment because he used objectively reasonable force and because the force was used to achieve the legitimate penological interests of maintaining prison safety and security.[2] Specifically, defendant Jackson argues that retrieving contraband from inmates and preventing inmates from swallowing contraband serve the legitimate penological goals of maintaining prison safety and security, and that the undisputed evidence, in particular the body worn camera ("BWC") video, clearly shows that plaintiff had contraband which he hid in his mouth and that defendant Jackson initially used mild force and only escalated the use of force in proportion to plaintiff's resistance.[3]

---

[2] The Court GRANTS IN PART AND DENIES IN PART defendant Jackson's unopposed request for judicial notice. Dkt. No. 25.

The Court DENIES defendant Jackson's request for judicial notice that, in the complaint, plaintiff acknowledged that defendant Jackson asked him to spit out what he had in his mouth. In essence, defendant Jackson is asking the Court to conclude at summary judgment that plaintiff is bound by this factual allegation set forth in his *pro se* complaint. Judicial notice is not appropriate to resolve disputed issues of fact that turn on a party's credibility. Fed. R. Evid. 201(b) (court may only judicially notice facts that are not subject to reasonable dispute and that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned).

The Court GRANTS defendant Jackson's remaining requests for judicial notice because the documents are documents or pleadings filed in a court and have a direct relation to the matters at issue. *See U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (federal courts may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue") (internal quotation marks and citation omitted); Fed. R. Evid. 201(b). The Court takes judicial notice of the excerpted criminal records from *People v. Robinson*, Alameda County Superior Court criminal case no. 18-CR002503 ("*Robinson I*"), Dkt. No. 25, Ex. E; and the excerpted criminal records from *People v. Robinson*, Solano County Superior Court criminal case no. FCR315270 ("*Robinson II*"), Dkt. No. 25, Ex. F. The Court also takes judicial notice that, according to these documents, in *Robinson I*, as part of his plea, plaintiff admitted to having a prior felony conviction in 2011 of possessing illegal substances in a jail facility, in violation of Cal. Penal Code § 4573.6(a), and, in *Robinson II*, plaintiff pled guilty to the felony of possessing drugs or paraphernalia in a jail or prison, in violation of Cal. Penal Code § 4573.6.

[3] Defendant Jackson also argues that *James v. Maguire Corr. Facility*, C No. 10-01795 SI, 2011

1   Plaintiff argues that there was no need for any application of force because defendant

2   Jackson could have cuffed plaintiff and ordered an x-ray to determine whether plaintiff possessed

3   contraband; that defendant Jackson did not make an effort to employ the least amount of force

4   necessary; and that there was no legitimate penological need because it is not proven that plaintiff

5   possessed a bindle/contraband.[4]  Dkt. No. 44 at 5-6.

6   When parties have opposing stories, but one is blatantly contradicted by the record such

7   that no reasonable jury would believe it, the Court should not adopt that version of events.  *Scott v.*

8   *Harris*, 550 U.S. 372, 380 (2007).  Plaintiff's allegations that defendant Jackson choked him, that

9   plaintiff began to lose consciousness, and that defendant Jackson then slammed him against the

10  door frame and "choke-slammed" him from behind onto the floor and onto his shoulder are

11  contradicted by the video.  The video also contradicts plaintiff's claim that it is purely speculative

12  that he had something in his mouth.  The video shows defendant Jackson repeatedly ordering

13  plaintiff to "spit it out" and plaintiff keeping his mouth closed (Jackson Decl., Ex. B (BWC video)

14  at 00:23-00:52); defendant Jackson placing his fingers underneath plaintiff's jaw with no

15  indication that plaintiff was having trouble breathing or passing out as a result (Jackson Decl., Ex.

---

WL 2650723 (N.D. Cal. Jul. 6, 2011), supports a finding that the force used was not excessive. *James* is inapplicable here because it addresses an excessive force claim brought by a prisoner, not a pretrial detainee, and applies the subjective standard for Eighth Amendment excessive force claims.  *James*, 2011 WL 2650723 at *3-*5.

[4] Plaintiff states that he has not had the opportunity to examine all the video from the BWC. Dkt. No. 44 at 1.  He also claims that if he had been more knowledgeable about the law, he would have sought discovery regarding defendant Jackson's history of use of force.  To the extent that plaintiff is claiming that he was unprepared to oppose the summary judgment motion, the record shows that any lack of preparation was due to plaintiff.  Plaintiff was clearly instructed what was necessary to oppose a summary judgment motion, was clearly instructed that he could engage in discovery after service was ordered, and had ample time to conduct discovery.  On January 29, 2019, the Court found that the complaint stated a cognizable excessive force claim and ordered service on defendant Jackson.  Dkt. No. 10.  In the order of partial service, the Court informed plaintiff that he could engage in discovery at that time, and instructed him what was necessary to oppose a dispositive motion.  Dkt. No. 10 at 5-6.  On August 27, 2019, defendant Jackson filed the pending summary judgment motion.  Dkt. Nos. 24, 25, 26. The Court granted plaintiff five extensions of time, for a total of over nine months, to prepare and file his opposition.  *See* Dkt. Nos. 28, 30, 35, 38, 40, 42, 43.  In none of plaintiff's requests for extensions of time did plaintiff notify either the Court or defendant Jackson that he had not received the flashdrive or CD showing the BWC video, or that he was otherwise unable to view the video.  *See id.*  Plaintiff's belated claim that he was unable to effectively engage in discovery or view evidence seems dubious given his failure to raise these issues earlier and the extensive amount of time he has been granted to prepare his opposition.

1  B (BWC video) at 00:23-00:27); plaintiff escaping defendant Jackson's grip and running towards
2  the door (Jackson Decl., Ex. B (BWC video) at 00:30-00:33); correctional officials chasing after
3  plaintiff and attempting to grab him but plaintiff slipping out of their grasp (Jackson Decl., Ex. B
4  (BWC video) at 00:30-00:33); plaintiff pulling away from the door as he neared it and turning
5  himself sideways so that his back was against the side wall next to, and perpendicular, to the door,
6  with his left shoulder closest to the door (Jackson Decl., Ex. B (BWC video) at 00:33-00:37); and
7  the parties struggling at the door (Jackson Decl., Ex. B (BWC video) at 00:33-00:37). Right
8  before the video goes dark, the video shows an officer attempting to grasp plaintiff from behind
9  and the parties falling to the ground (Jackson Decl., Ex. B (BWC video) at 00:36-00:37). When
10 the video resumes, plaintiff is lying on his stomach and defendant Jackson's fingers are on the
11 back of plaintiff's neck and not choking plaintiff (Jackson Decl., Ex. B (BWC video) at 00:45-
12 00:52). Finally, the video captures plaintiff admitting that he had placed something in his mouth,
13 saying that it was a kite (Jackson Decl., Ex. B (BWC video) at 03:24-03:38). The Court therefore
14 declines to adopt plaintiff's version of the disputed events.
15       The question then is whether, given the facts and circumstances of this particular case, the
16 force used by defendant Jackson was objectively unreasonable. The Supreme Court has
17 recognized that deterring the possession of contraband serves the legitimate penological purpose
18 of maintaining safety and order at correctional institutions, and that courts should allow
19 correctional officials "substantial discretion to devise reasonable solutions to the problems they
20 face [regarding ensuring safety and order]." *Florence v. Bd. of Chosen Freeholders of Cty. of*
21 *Burlington*, 566 U.S. 318, 326-28 (2012).
22       Here, it is undisputed that plaintiff had something in his mouth. Plaintiff admitted on
23 video to having something in his mouth. Jackson Decl., Ex. B (BWC video) at 03:24-03:38. It is
24 also undisputed that plaintiff refused verbal orders to spit out what was in his mouth; that plaintiff
25 physically resisted correctional officials' efforts to force him to spit out what was in his mouth;
26 defendant Jackson did not know what the contraband was; there was a concern that plaintiff could
27 ingest something harmful; and plaintiff attempted to escape correctional officials.
28       The force used by defendant Jackson was reasonable under the circumstances. Defendant

8

Jackson reasonably placed pressure beneath plaintiff's jaw to prevent him from swallowing something potentially harmful. Ingesting methadone or other illicit substances posed a risk to plaintiff's health. Defendant Jackson also reasonably pulled at plaintiff and wrestled him to the floor after plaintiff refused orders to spit out what was in his mouth and tried to run out of the room. Defendant Jackson's use of force escalated in proportion to plaintiff's resistance, and defendant Jackson only used the force necessary to subdue plaintiff. In total, the entire encounter lasted less than a minute, with the alleged excessive force – choking, followed by being slammed into the door frame and the floor – lasting approximately thirty seconds.

The record is inconclusive as to whether plaintiff suffered a shoulder dislocation. The radiologist concluded that the x-ray indicated a shoulder dislocation, whereas prison health care staff concluded that the x-ray only showed a shoulder strain/sprain. Viewing the facts in the light most favorable to plaintiff, the Court presumes that defendant Jackson's actions dislocated plaintiff's shoulder. However, the extent of the injury suffered is only one of the factors to be considered under *Kingsley*. Based on the evidence submitted, the *Kingsley* considerations discussed above indicate that the force used by defendant Jackson was not objectively unreasonable and that his actions were rationally related to a legitimate governmental objective of preserving institutional safety and order. *See Kingsley*, 576 U.S. at 397. Accordingly, defendant Jackson has met his initial burden of demonstrating the absence of a genuine issue of material fact with respect to the excessive force claim against him. *See Celotex Corp.*, 477 U.S. at 323.

The burden then shifts to plaintiff to designate specific facts showing that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324. He must do so by going "beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admission on file." *Id.* Plaintiff has failed to meet this burden.

In his opposition, plaintiff makes the following three arguments.

First, plaintiff argues that defendant Jackson should have had him undergo an x-ray and/or placed him on contraband watch.[5] Placing plaintiff on contraband watch or subjecting plaintiff to

---

[5] Plaintiff also argues that defendant Jackson is selective about using force, i.e. forcing an inmate to spit out contraband, when an inmate is suspected of possessing contraband. He argues that

9

1    an x-ray would not address the prison's legitimate penological interest in preventing inmates from

2    swallowing potentially toxic substances.

3          Second, plaintiff argues that defendant Jackson should have sought to use the least amount

4    of force possible. However, the applicable legal standard asks whether the force used was

5    objectively reasonable. The applicable legal standard does not place an onus upon correctional

6    officials to use only the least amount of force reasonable. In addition, the video indicates that

7    defendant Jackson initially used the minimum force necessary to prevent plaintiff from

8    swallowing the contraband and to recover the contraband by first conducting a strip search and

9    then placing pressure underneath plaintiff's jaw. The video further indicates that defendant

10   Jackson escalated the force only when plaintiff increased his resistance. Finally, the video shows

11   that defendant Jackson grabbed plaintiff by the right shoulder because plaintiff's left shoulder was

12   between the wall and the door and the parties fell to the floor in the struggle to grab plaintiff.

13         Third, plaintiff argues that because a bindle was not recovered, defendant Jackson's claim

14   that he used force for the legitimate penological purpose of maintaining prison order and security

15   is speculative. This argument is self-serving and misleading. Plaintiff admitted to having a kite in

16   his mouth. The failure to recover or discover the potential contraband was thus apparently due to

17   plaintiff disposing of it.

18         Based on the evidence presented, defendant Jackson has shown that there is no genuine

19   issue of material fact with respect to the excessive force claim. *See Celotex Corp.*, 477 U.S. at

20   323. In opposition, plaintiff has not provided any objective evidence that defendant Jackson's use

21   of force not rationally related to a legitimate governmental objective or that it was excessive in

22   relation to that purpose. Plaintiff has failed to point to specific facts showing that there is a

23   genuine issue for trial, or identify with reasonable particularity the evidence that precludes

---

defendant Jackson allowed inmate Holmes to have his stomach x-rayed instead of using force to make inmate Holmes spit out the contraband. Dkt. No. 44 at 3. The applicable legal standard for an excessive force claim brought by a pretrial detainee is an objective one. The question is not whether defendant Jackson treated all inmates similarly, but whether the force used was objectively unreasonable under the circumstances. Defendant Jackson's treatment of inmate Holmes, without more details, has no bearing upon whether defendant Jackson's treatment of plaintiff was objectively unreasonable.

1    summary judgment.  Accordingly, defendant Jackson is entitled to judgment as a matter of law on
2    the excessive force claim against him.  *See Celotex Corp.*, 477 U.S. at 323.

### IV.     Qualified Immunity

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  The doctrine of qualified immunity attempts to balance two important and sometimes competing interests—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).  The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "'swiftly and firmly'" in situations where the rules governing their actions are often "'voluminous, ambiguous, and contradictory.'"  *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citing *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties."  *Id.*  To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232.  Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 236.

"An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate."  *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration and omission in original) (citation omitted).  This is an "exacting standard" that "gives government officials breathing room to make reasonable but mistaken

11

1  judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the

2  law." *Id.* (alteration in original) (internal quotation marks omitted).

> [E]xisting precedent must have "placed beyond debate the unconstitutionality of" the officials' actions, as those actions unfolded in the specific context of the case at hand. *Taylor*, 135 S. Ct. at 2044. Hence, a plaintiff must prove that "precedent on the books" at the time the officials acted "would have made clear to [them] that [their actions] violated the Constitution." *Id*. at 2045.
>
> As the Supreme Court again stressed recently, "[t]he dispositive question is 'whether the violative nature of [the defendants'] particular conduct is clearly established.'" Moreover, "[t]his inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (emphasis added) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

*Hamby v. Hammond*, 821 F.3d 1085, 1090–91 (9th Cir. 2016) (alterations in original) (citations omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305 (2015)) (per curiam).

The "fact-specific, highly contextualized nature of the 'clearly established' analysis" applies, regardless of the constitutional right at issue. *Hamby*, 821 F.3d at 1092. For example, in an excessive-force case where officers shot a woman who was holding a knife and ignoring officers' orders to drop the weapon, "it [did] not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).

On the record before the Court, viewed in the light most favorable to plaintiff, defendant Jackson prevails as a matter of law on his qualified immunity defense because, as discussed above, the record establishes no Fourteenth Amendment violation and because, at the time of the incident, there was no clearly established law requiring that correctional officials use x-rays to determine whether an inmate had swallowed contraband. There is no Supreme Court precedent prior to — or after — April 22, 2018, discussing whether a correctional official has used excessive force, in violation of the Fourteenth Amendment, when the correctional official, in an attempt to prevent an inmate from swallowing contraband, places his fingers under the inmate's jaw to prevent him from swallowing and, when the inmate resists and attempts to escape the room so that the contraband cannot be recovered, grabs the inmate and wrestles him to the ground. Plaintiff's arguments against qualified immunity are premised on his version of the relevant events, and plaintiff's version is contradicted by the video evidence. Accordingly, defendant Jackson's motion for

summary judgment based on qualified immunity should be granted.

## CONCLUSION

For the reasons set forth above, the Court GRANTS defendant Jackson's motion for summary judgment.[6]  The Clerk shall enter judgment in favor of defendant Jackson and against plaintiff, and close the case.  All pending motions are DENIED as moot.

**IT IS SO ORDERED.**

Dated: 10/2/2020

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[6] In light of the Court's grant of summary judgment in favor of defendant Jackson, plaintiff's request for appointment of counsel is DENIED.  Dkt. No. 46.

13